# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JOHANNA FISHER, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES, et al.,<br><br>Defendants. | Case No. 1:20-cv-01471-JLT-EPG<br><br>FINDINGS AND RECOMMENDATION TO:<br><br>(1) GRANT IN PART AND DENY IN PART PORTERVILLE UNIFIED SCHOOL DISTRICT'S MOTION TO DISMISS (ECF No. 55);<br><br>(2) GRANT UNITED STATES' MOTION TO DISMISS (ECF No. 58);<br><br>(3) DISMISS PLAINTIFF FISHER'S NEGLIGENCE CLAIMS SET FORTH IN SECOND AND EIGHTH CAUSES OF ACTION WITH PREJUDICE; AND<br><br>(4) DISMISS BIVENS AND NEGLIGENCE CLAIMS AGAINST DEFENDANT UNITED STATES AND DOES 1 TO 10 WITH PREJUDICE<br><br>OBJECTIONS, IF ANY, DUE WITHIN FOURTEEN DAYS |

Johanna Fisher, individually and on behalf of her minor child J.G. (collectively, "Plaintiffs"), are proceeding with a second amended complaint ("SAC") asserting claims against the United States of America ("United States"), Porterville Unified School District ("PUSD"), Doe Defendants 1–10 (National Guard employees), and Doe Defendants 11–20 (collectively, "Defendants"). (ECF No. 50.) Before the Court are the United States and PUSD's motions to

dismiss. (ECF Nos. 55, 58.) For the reasons described below, the undersigned recommends that Defendant PUSD's motion to dismiss (ECF No. 55) be granted in part and denied in part and Defendant United States' motion to dismiss (ECF No. 58) be granted.

### I.        SUMMARY OF ALLEGATIONS

The SAC alleges as follows:

In or around August 2018, Plaintiff J.G. started school at the Porterville Military Academy ("PMA") of the Porterville Unified School District ("PUSD"), and soon thereafter, J.G. met James Van Norton ("Van Norton"). Van Norton was a teacher at PMA and an active member of the Army National Guard and/or California Army National Guard (collectively, "National Guard"). National Guard employees (who have been named as Defendants Does 1 to 10) helped to vet, recommend, and place Van Norton at PMA/PUSD.[1] J.G. first met Van Norton at an entrance camp in San Luis Obispo as part of PMA's cadet corps. Van Norton was one of the adult supervisors known as a Teacher Advisor Counselor ("TAC"). J.G. later saw Van Norton on the PMA campus, where he was a TAC for the Charlie Company at PMA while J.G. was part of the Bravo Company.

A couple of weeks later, Van Norton approached J.G. in between classes. Noting that J.G. appeared to be struggling, Van Norton said that if J.G. needed someone to speak with, then he was there for her. On or about October 15, 2018, J.G. attempted to cut her wrists during a bathroom break. Later that day, J.G. decided to speak with Van Norton about what had happened, and he took her to the school office, which provided her with a mental health referral. J.G. was asked to make a list of people she could turn to if something similar happened in the future. She included Van Norton on the list. The following day, J.G. commenced visiting Van Norton's classroom during breaks and lunch on practically a daily basis. The classroom typically had other students during those times.

At some point during these classroom visits, Van Norton shared his Snapchat and Instagram accounts with J.G. and these other students. Initially after J.G. connected with Van

---

[1] The SAC alleges that Van Norton and Does 1 to 10 were employees of the United States government at the time of the events at issue in the SAC. The SAC also alleges that the National Guard employed Van Norton and had control over his actions at the time of the conduct at issue in the SAC.

1   Norton's social media accounts, the communications from Van Norton were mostly banal and

2   motivational. The nature of the communications soon changed to include odd emojis and pictures

3   of Van Norton in his shorts or holding a beer. Van Norton dismissed these communications by

4   stating that he "can't believe I said that" and started to join in with other students in telling dirty

5   jokes in the classroom during breaks.

6          Van Norton's texts and social media communications to J.G. began to become more

7   frequent, including during school hours, and he started to call J.G. beautiful. One day after

8   morning break J.G. was about to leave his classroom right after the other students left when Van

9   Norton closed the door, pushed J.G. against the wall, and kissed her. Later that same morning,

10  Van Norton texted J.G. to ask her what she thought about what happened. J.G. said she was

11  surprised, and Van Norton said he was surprised that she kissed him back. He also told J.G. not

12  to tell anyone about what happened because he would lose his job. J.G. returned to Van Norton's

13  classroom during lunch. She again was the last to leave following lunch, and Van Norton kissed

14  her again. He then said she should go to class because she would be in trouble if she was late.

15  J.G. did not understand what was happening, but she thought Van Norton was there to help her.

16         During the rest of October 2018, it became the norm for J.G. to stay in Van Norton's

17  classroom during morning break and lunch after everyone else left, and Van Norton would kiss

18  her. These encounters began lasting longer, and Van Norton would give J.G. a pass if she was

19  late to class. This, in turn, preempted the school calling J.G.'s mother regarding J.G.'s tardiness.

20  Van Norton also started touching J.G.'s waist, thigh, buttocks, and crotch. In late October 2018,

21  Van Norton started laying J.G. down on the table behind his desk and would touch her all over.

22  Initially the petting was over the clothes, but by early November 2018, Van Norton touched

23  J.G.'s chest and crotch under her clothes.

24         Through November, texting and social media communications became more graphic and

25  controlling. After Halloween 2018, Van Norton started to give J.G. gifts, such as stuffed

26  monkeys, tongue piercings, and AirPods. Van Norton began performing oral sex on J.G. in his

27  classroom and would rub his body against her. Van Norton persuaded J.G. to perform oral sex on

28  him. J.G. did not have any experience with groping or oral sex prior to her interactions with Van

Norton. While both were working on a school float for the Veteran's Day Parade, Van Norton told J.G. to meet him behind one of the school buildings where he kissed and groped her.

In mid-November 2018, Van Norton was put on leave by the school for other issues but continued to text J.G. and make arrangements to meet with her. In late November 2018, Van Norton arranged to meet J.G. during a basketball tournament in his vehicle in the school parking lot. He pulled her pants down and groped her.

In December 2018, Van Norton began meeting J.G. near her home. The kissing, groping, and oral sex continued in his vehicle. Van Norton shared complaints about his childhood and home life and would tell J.G. that he wanted to divorce his wife and go away with J.G. J.G. thought that he would marry her.

On or about December 22 or 23, 2018, J.G. and Van Norton had vaginal sex for the first time. It occurred in Van Norton's vehicle near J.G.'s home. Van Norton had been encouraging J.G. to have vaginal sex when she was ready. Although J.G. did not feel ready, Van Norton convinced her that it was going to be okay and that she could trust him. After the December 22 or 23, 2018 interaction, J.G.'s encounters with Van Norton would typically involve vaginal sex. Van Norton continued to warn J.G. to not say anything about their relationship because he would get in trouble.

On or about March 20, 2019, Van Norton arranged to meet with J.G. near her home at around 3 a.m. J.G.'s mother noticed that J.G. was not home and called the police. When J.G. came home, she said she went for a walk. Later that day, J.G.'s mother asked to see J.G.'s phone and saw many inappropriate Instagram messages from Van Norton. The Sheriffs were called, and J.G. admitted to what had been occurring between her and Van Norton. Soon thereafter, Van Norton was arrested. A felony complaint has been filed against him, and a criminal protective order is in place.

The SAC alleges that Defendants knew or should have known about the dangers that Van Norton presented to students like J.G. because there had been similar allegations and investigations at his prior school and other PUSD students had complained of Van Norton's inappropriate behavior to National Guard officials (Does 1 to 10). However, these complaints

1   went largely unaddressed and ignored. For instance, Nathaniel Gomez (a student at Porterville

2   High School who was in the cadet corps) reported to Captain Archer with PUSD that he had seen

3   Van Norton acting inappropriately at the entrance camp in San Luis Obispo in August 2018, but

4   Captain Archer brushed aside the allegations.

5   The SAC raises the following claims: (1) violations of the Fourth and/or Fourteenth

6   Amendments pursuant <u>Bivens</u> against Does 1 to 10; (2) negligence against PUSD, the United

7   States, and Does 11 to 20; (3) negligent hiring, retention, and supervision of staff against PUSD;

8   and (3) misrepresentation against PUSD.

9   **II.    PROCEDURAL HISTORY**

10   Johanna Fisher, individually and on behalf of her minor child J.G., filed the complaint

11   commencing this action on October 15, 2020. (ECF No. 1.) On January 29, 2021, a first amended

12   complaint ("FAP") was filed. (ECF No. 19.) Defendants California Military Department

13   ("CMD"), PUSD, and Army National Guard and California Army National Guard ("National

14   Guard") filed motions to dismiss. (ECF Nos. 25, 33, 39.) On February 3, 2022, the Court granted

15   CMD's motion to dismiss, granted in part and denied in part PUSD's motion to dismiss, granted

16   the National Guard's motion to dismiss, and granted Plaintiff leave to file a second amended

17   complaint. (ECF No. 48.)

18   On March 21, 2022, Plaintiffs filed the SAC. (ECF No. 50.) On April 4, 2022, Defendant

19   PUSD filed a motion to dismiss. (ECF No. 55.) On June 3, 2022, Defendant United States filed a

20   motion to dismiss. (ECF No. 58.) On June 17, 2022, the parties stipulated to the voluntary

21   dismissal of Defendant CMD without prejudice and CMD was terminated as a defendant in this

22   matter. (ECF No. 61, 62.) The District Judge referred the motions to dismiss to the undersigned.

23   (ECF No. 66.)

24   **III.   LEGAL STANDARDS**

25   **A.  Motion to Dismiss**

26   In considering a motion to dismiss, the Court must accept all allegations of material fact

27   in the complaint as true. <u>Erickson v. Pardus</u>, 551 U.S. 89, 93–94 (2007); <u>Hosp. Bldg. Co. v. Rex</u>

28   <u>Hosp. Trustees</u>, 425 U.S. 738, 740 (1976). The Court must also construe the alleged facts in the

light most favorable to the plaintiff. <u>Scheuer v. Rhodes</u>, 416 U.S. 232, 236 (1974), <u>abrogated on other grounds by</u> <u>Harlow v. Fitzgerald</u>, 457 U.S. 800 (1982); <u>Barnett v. Centoni</u>, 31 F.3d 813, 816 (9th Cir.1994) (per curiam). All ambiguities or doubts must also be resolved in the plaintiff's favor. <u>See</u> <u>Jenkins v. McKeithen</u>, 395 U.S. 411, 421 (1969). In addition, *pro se* pleadings "must be held to less stringent standards than formal pleadings drafted by lawyers." <u>Hebbe v. Pliler</u>, 627 F.3d 338, 342 (9th Cir. 2010).

A motion to dismiss pursuant to Rule 12(b)(1) is a challenge to the court's subject matter jurisdiction. <u>See</u> Fed. R. Civ. P. 12 (b)(1). "A Rule 12(b)(1) jurisdictional attack may be facial or factual." <u>Safe Air for Everyone v. Meyer</u>, 373 F.3d 1035, 1039 (9th Cir. 2004) (citing <u>White v. Lee</u>, 227 F.3d 1214, 1242 (9th Cir. 2000)). "In a facial attack, the challenger asserts that the allegations contained in a complaint are insufficient on their face to invoke federal jurisdiction." <u>Safe Air</u>, 373 F.3d at 1039. "By contrast, in a factual attack, the challenger disputes the truth of the allegations that, by themselves, would otherwise invoke federal jurisdiction." <u>Id.</u>

A motion to dismiss pursuant to Rule 12(b)(6) operates to test the sufficiency of the complaint. <u>See</u> <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 679 (2009). Rule 8(a)(2) requires only "a short and plain statement of the claim showing that the pleader is entitled to relief" in order to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." <u>Bell Atlantic Corp. v. Twombly</u>, 550 U.S. 544, 555 (2007) (quoting <u>Conley v. Gibson</u>, 355 U.S. 41, 47 (1957)). "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." <u>Scheuer</u>, 416 U.S. at 236.

The first step in testing the sufficiency of the complaint is to identify any conclusory allegations. <u>Iqbal</u>, 556 U.S. at 679. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." <u>Id.</u> at 678 (citing <u>Twombly</u>, 550 U.S. at 555). "[A] plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." <u>Twombly</u>, 550 U.S. at 555 (citations and quotation marks omitted).

After assuming the veracity of all well-pleaded factual allegations, the second step is for the court to determine whether the complaint pleads "a claim to relief that is plausible on its

face." Iqbal, 556 U.S. at 678 (citing Twombly, 550 U.S. at 556) (rejecting the traditional 12(b)(6) standard set forth in Conley, 355 U.S. at 45–46). A claim is facially plausible when the plaintiff "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678 (citing Twombly, 550 U.S. at 556). The standard for plausibility is not akin to a "probability requirement," but it requires "more than a sheer possibility that a defendant has acted unlawfully." Iqbal, 556 U.S. at 678.

In deciding a Rule 12(b)(6) motion, the Court generally may not consider materials outside the complaint and pleadings. Cooper v. Pickett, 137 F.3d 616, 622 (9th Cir. 1998); Gumataotao v. Dir. of Dep't of Revenue & Taxation, 236 F.3d 1077, 1083 (9th Cir. 2001).

## B.  Leave to Amend

Courts "should freely give leave [to amend] when justice so requires." Fed. R. Civ. P. 15(a)(2). "[P]ublic policy strongly encourages courts to permit amendments," and "[t]he policy of allowing amendments 'is to be applied with extreme liberality.'" Waldrip v. Hall, 548 F.3d 729, 732 (9th Cir. 2008) (quoting Owens v. Kaiser Found. Health Plan, Inc., 244 F.3d 708, 712 (9th Cir. 2001)). "However, 'liberality in granting leave to amend is subject to several limitations.'" Cafasso, U.S. ex rel. v. Gen. Dynamics C4 Sys., Inc., 637 F.3d 1047, 1058 (9th Cir. 2011) (quoting Ascon Props., Inc. v. Mobil Oil Co., 866 F.2d 1149, 1160 (9th Cir. 1989)). A court "may exercise its discretion to deny leave to amend due to 'undue delay, bad faith, or dilatory motive on part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party . . . , [and] futility of amendment." Carvalho v. Equifax Info. Servs., LLC, 629 F.3d 876, 892–93 (9th Cir. 2010) (alterations in original) (quoting Foman v. Davis, 371 U.S. 178, 182 (1962)).

"Not all of the factors merit equal weight." Eminence Capital, LLC v. Aspeon, Inc., 316 F.3d 1048, 1052 (9th Cir. 2003). "Futility of amendment can, by itself, justify the denial of a motion for leave to amend," Bonin v. Calderon, 59 F.3d 815, 845 (9th Cir. 1995), but "[u]ndue delay by itself is insufficient to justify denying leave to amend," United States v. United Healthcare Ins. Co., 848 F.3d 1161, 1167 (9th Cir. 2016). "[I]t is the consideration of prejudice to the opposing party that carries the greatest weight." Eminence Capital, 316 F.3d at

1052. "Absent prejudice, or a strong showing of any of the remaining [ ] factors, there exists a *presumption* under Rule 15(a) in favor of granting leave to amend." Id.

## IV.   DISCUSSION

### A.  Porterville Unified School District

Defendant PUSD moves to dismiss pursuant to Rule 12(b)(6), arguing that the Second and Eighth Causes of Action for negligence fail to allege any statutorily based theory of direct liability, fail to allege any facts showing that Defendant PUSD owed Plaintiff Fisher a duty of care, fail to state sufficient facts, and that the Eighth Cause of Action is redundant to the Second Cause of Action.[2] (ECF No. 55-1 at 2.)

#### 1.  Duty of Care Owed to Plaintiff Fisher

> To establish a cause of action for negligence, the plaintiff must show that the "defendant had a duty to use due care, that he breached that duty, and that the breach was the proximate or legal cause of the resulting injury." (*Nally v. Grace Community Church* (1988) 47 Cal.3d 278, 292, 253 Cal.Rptr. 97, 763 P.2d 948.) Recovery for negligence depends as a threshold matter on the existence of a legal duty of care. (*Gas Leak Cases*, *supra*, 7 Cal.5th at p. 397, 247 Cal.Rptr.3d 632, 441 P.3d 881.)
>
> Duty is not universal; not every defendant owes every plaintiff a duty of care. A duty exists only if "'the plaintiff's interests are entitled to legal protection against the defendant's conduct.'" (*Dillon v. Legg* (1968) 68 Cal.2d 728, 734, 69 Cal.Rptr. 72, 441 P.2d 912, quoting Prosser, Torts (3d ed. 1964) § 53, p. 332.)

Brown v. USA Taekwondo, 11 Cal. 5th 204, 213 (2021). "Where the defendant has neither performed an act that increases the risk of injury to the plaintiff nor sits in a relation to the parties that creates an affirmative duty to protect the plaintiff from harm," California Supreme Court "cases have uniformly held the defendant owes no legal duty to the plaintiff." Id. at 216.

The SAC's Second Cause of Action is for "negligence on the part of the Defendants in their failure to identify, address, correct, and/or warn about the dangerous situation that caused J.G.'s injuries, and/or its negligent hiring, supervising, retaining, placing and/or training of employees to properly identify, address, correct, and/or warn about such conditions." (ECF No.

---

[2] Defendant PUSD does not seek to dismiss the Second Cause of Action with respect to Plaintiff J.G. (ECF No. 55-1 at 2–5.)

50 at 11.) The SAC's Eighth Cause of Action is for "negligent hiring, retention and supervision of staff," alleging that: "the administration and/or staff at PUSD were not properly trained and/or were otherwise unfit or incompetent to perform the duties assigned to them in hiring, supervising, and/or retaining Van Norton, and they performed those duties in an incomplete and incompetent manner"; PUSD "knew or should have known that their staff were not properly trained and/or were otherwise unfit or incompetent to safely perform the duties assigned to them"; PUSD "had advance knowledge of the unfitness of their staff and employed them with a knowing disregard of the rights or safety of others"; and PUSD "authorized their staff's conduct, and/or . . . knew of the staff's wrongful conduct and adopted or approved the conduct after it occurred." (ECF No. 50 at 13.)

PUSD contends that because "[t]here are no allegations she had any connection with PMA other than the fact her daughter went to school there[,] Defendant PUSD owed no duty to Plaintiff Johanna Fisher simply because her daughter was a student there and allegedly the victim of sexual molestation." (ECF No. 55-1 at 4.) Plaintiffs argue that they "have alleged facts sufficient to establish that there is a duty of care owed by PUSD to Ms. Fisher, especially where as here PUSD is placing its employees in positions of trust as teachers for our community's children, and where parents have a reasonable expectation that their children will be provided an 'environment for their child that is safe and supportive of learning.'" (ECF No. 57 at 14–15 (citation omitted).) Plaintiffs also emphasize that "the SAC alleges that the misrepresentations regarding campus security and the security cameras were made directly to Ms. Fisher." (Id. at 15.)

> The duty owed to parents of school students is limited under California law. Generally, a school's duty to use due care when supervising students is owed to students only, and not parents. *See Martin v. United States*, 984 F.2d 1033, 1036-37 (9th Cir. 1993)(applying Cal. law); *Steven F. v. Anaheim Union High Sch. Dist.*, 112 Cal. App. 4th 904 (2004). California law allows for recovery when the plaintiff is a direct victim of the defendant's negligence, but is reluctant to find a duty when "negligence that causes injury to a third-party collaterally results in the plaintiff's emotional distress . . . ." *Martin*, 984 F.2d at 1036. Thus, to recover for negligence, a plaintiff must show he was a direct victim, *i.e.*, that the "negligent conduct was directed at the plaintiff . . . ." *Id.*

1  Ramirez v. Escondido Unified Sch. Dist., No. 11CV1823 DMS (BGS), 2013 WL 12191986, at

2  *8 (S.D. Cal. Apr. 8, 2013).

3        In Phyllis P. v. Superior Court, 183 Cal. App. 3d 1193 (1986), the school learned that an

4  eight-year-old student, Ciera, had been sexually molested by a thirteen-year-old student, Dario, a

5  number of times but did not notify Ciera's parent of those incidents.[3] Ciera subsequently was

6  raped. Id. at 1195. Ciera's parent "theorize[d] that had she been informed of the earlier sexual

7  assaults she could have taken precautionary measures to prevent the rape which ultimately

8  occurred." Id. The court found that the parent should be able to proceed with her negligent

9  infliction of emotional distress claim, noting that "defendants had a duty to notify [the parent]

10  upon learning of the first series of sexual assaults upon" her daughter and that the parent was

11  "asserting a cause of action as a direct victim of defendants' negligent act, or failure to act, and

12  not for injuries based upon her direct observation of the injury to her daughter." Phyllis P., 183

13  Cal. App. 3d at 1196, 1197.

14        In contrast, the Ninth Circuit applying California law in Martin v. United States, 984 F.2d

15  1033 (9th Cir. 1993), found no liability to the parent of a six-year-old who was enrolled in a day

16  care, taken on an outing to a park, separated from the group as a result of the defendant's

17  negligence, abducted, and raped. Id. at 1034–35. The Ninth Circuit observed that "[w]hen . . .

18  negligence that causes injury to a third-party collaterally results in the plaintiff's emotional

19  distress, but the tort is not also to the plaintiff, California courts have been reluctant to find a

20  duty and allow recovery for the negligent infliction of emotional distress." Id. at 1036. Because

21  the defendant's "negligent supervision . . . was directed at" the child, the mother's "claim that

22  she is entitled to recovery under the direct victim rule because she was [the] mother and [the

23  defendant] owed her a duty not to supervise her children negligently goes beyond any duty

24  heretofore recognized by California courts." Id.

25  ///

---

26  [3] Ciera reported the incidents to her teacher, who consulted with the school psychologist. Together the teacher and

27  school psychologist decided not to notify Ciera's parent of the incidents. Ciera was counseled by the psychologist, but her parent was not notified of the counseling. The school principal learned of the incidents and called Dario into his office, telling Dario to stop and that if he continued his parents would be notified. The principal also failed to

28  notify Ciera's parent of the incidents.

1    Similarly, in <u>Steven F. v. Anaheim Union High School District</u>, 112 Cal. App. 4th 904
2    (2003), the California Court of Appeal found no liability to the parents of a high school student
3    who engaged in a sexual relationship with a teacher. Relying on <u>Martin</u>, the court stated that
4    "[a]ssuming that there was any negligent supervision of the teacher here . . . it was at the most
5    directed at not noticing the rather too-close relationship between the student and the teacher, not
6    directed at the parents." <u>Id.</u> at 912. The court distinguished <u>Phyllis P.</u> "in no less than three major
7    ways," noting that: (1) in <u>Phyllis P.</u> "there was warning of propensity on the part of the 13-year-
8    old student who committed the rape," whereas in <u>Steven F.</u> "there were no prior incidents giving
9    any warning of any tendency on the part of the teacher to engage in sexual acts with his
10   students"; (2) in <u>Phyllis P.</u> "there was clear knowledge of the danger on the part of the school,
11   including its management" because the victim reported the molestations to her teacher, the
12   teacher consulted with the school psychologist, and the school principal later learned of the
13   molestations, whereas in <u>Steven F.</u> "there was no unambiguous knowledge of danger on the part
14   of any teacher, much less a district manager such as the school principal" because "[a]t most a
15   small handful of teachers who might have observed the student and teacher here being too close
16   too often didn't put two and two together and go to anyone in district management"; and (3) in
17   <u>Phyllis P.</u> "there was a conscious decision to preempt the parents from learning of the possibility
18   of danger once it was known." <u>Steven F.</u>, 112 Cal. App. 4th at 915. "[T]he decision by school
19   officials not to inform the parent of the danger posed by the 13-year-old was clearly a decision
20   'directed at' the parent, not the student. . . . The school officials in <u>Phyllis P.</u> were *deliberately*
21   usurping the parental prerogative to protect the child." <u>Steven F.</u>, 112 Cal. App. 4th at 915. In
22   contrast, because "there was no preemption or usurpation of the parental prerogative to take
23   measures to protect the child" and "no conscious decision not to inform the parents of the
24   relationship between the teacher and the student" in <u>Steven F.</u>, the court found no liability to the
25   parents. <u>Id.</u>
26        The Court finds that the instant case is more comparable to <u>Steven F.</u> than <u>Phyllis P.</u>
27   Here, any negligent conduct was directed at J.G., not Plaintiff Fisher. Although the SAC alleges
28   that there were warnings about Van Norton's propensity and inappropriate behavior, there are no

allegations that there was clear, unambiguous knowledge of the danger to J.G. on the part of the administration and/or staff at PUSD. Additionally, although PUSD staff told parents, including Plaintiff Fisher, that there would be security cameras on the PMA campus and classrooms, such statements do not amount to a deliberate usurpation of the parental prerogative to take measures to protect the child given that PUSD administration and/or staff made no conscious decision not to inform Plaintiff Fisher of the relationship between Van Norton and J.G. or to preempt Plaintiff Fisher from learning of the possibility of danger once it was known. Accordingly, as the SAC's Second and Eighth Causes of Action fail to allege facts showing that Defendant PUSD owed Plaintiff Fisher a duty of care, the undersigned recommends that Defendant PUSD's motion to dismiss be granted on this ground and the Second and Eighth Causes of Action be dismissed with respect to Plaintiff Fisher without leave to amend.

## 2. <u>Statutorily Based Theory of Liability</u>

Defendant PUSD also moves to dismiss the Second and Eighth Causes of Action because they fail to allege any statutorily based theory of liability. (ECF No. 55-1 at 2.) In light of the conclusion in section IV(A)(1), *supra*, the Court will only address Defendant PUSD's argument that "Plaintiff J.G. has also failed to state any statutory theory" of liability in the Eighth Cause of Action. (ECF No. 55-1 at 5.)

"In California, a governmental entity can only be sued in tort pursuant to an authorizing statute or enactment." <u>Van Ort v. Est. of Stanewich</u>, 92 F.3d 831, 840 (9th Cir. 1996) (citing <u>Lopez v. S. Cal. Rapid Transit Dist.</u>, 40 Cal.3d 780, 785 n.2 (1985); <u>Searcy v. Hemet Unified Sch. Dist.</u>, 177 Cal. App. 3d 792, 798 (1986)). "[T]o state a cause of action every fact essential to the existence of statutory liability must be pleaded with particularity, including the existence of a statutory duty." <u>Searcy</u>, 177 Cal. App. 3d at 802. "Since the duty of a governmental agency can only be created by statute or 'enactment,' the statute or 'enactment' claimed to establish the duty must at the very least be identified." <u>Id.</u>

> As to vicarious liability, Section 815.2(a) of the California Government Code "expressly makes the doctrine of *respondeat superior* applicable to public employers." <u>Hoff</u>, 19 Cal.4th at 932. Specifically, a "public entity is liable for injury proximately caused by an act or omission of an employee of the public entity within

> the scope of his employment if the act or omission would . . . have given rise to a cause of action against that employee or his personal representative." Cal. Gov. Code § 815.2(a). Direct liability, for its part, "must be based on a specific statute declaring [public entities] to be liable, or at least creating some specific duty of care" on the part of public entities. <u>Eastburn v. Reg'l Fire Prot. Auth.</u>, 31 Cal. 4th 1175, 1183 (2003); <u>Leon v. County of Riverside</u>, 64 Cal. App. 5th 837, 850 (2021).

<u>Mullins v. Cty. of Fresno</u>, No. 1:21-cv-00405-AWI-SAB, 2021 WL 5304015, at *7 (E.D. Cal. Nov. 15, 2021). Thus, whether pursuing a theory of vicarious or direct liability, "a plaintiff must plead the statutory basis for a claim against a government entity," and "[f]ailure to do so provides a ground for dismissal under Rule 12(b)(6)." <u>Id.</u> (citations omitted).

Here, "Plaintiffs maintain that the SAC has adequately alleged the statutory basis under California Government Code § 815.2 for J.G.'s Eighth Cause of Action." (ECF No. 57 at 13.) In the Eighth Cause of Action, "Plaintiff realleges paragraphs 1-9 of the complaint as though fully set forth herein." (ECF No. 50 at 13.) Paragraph 1, in turn, "refer[s] to and incorporates by reference Sections I through III inclusive, as though set fully herein." (ECF No. 50 at 10.) Section III, in turn, refers to attached Exhibit III.C., which states in pertinent part:

> Pursuant to Government Code section 820(a), "a public employee is liable for injury caused by his act or omission to the same extent as a private person." In addition, under Government Code section 815.2(a), "[a] public entity is liable for injury proximately caused by an act or omission of an employee of the public entity within the scope of his employment if the act or omission would . . . have given rise to a cause of action against that employee." Thus, since the PMA staff are employees of PUSD, and since it was reasonably foreseeable that PMA students would be harmed by the circumstances described above, then Defendants are similarly liable through respondeat superior for such actions.

(ECF No. 50 at 8.)

In <u>C.A. v. William S. Hart Union High School District</u>, 53 Cal. 4th 861 (2012), a student "sued his public high school guidance counselor and the school district for damages arising out of sexual harassment and abuse by the counselor." <u>Id.</u> at 865. The issue before the California Supreme Court was whether the school district could be found vicariously liable under California Government Code section 815.2 "not for the acts of the counselor, which were outside the scope of her employment, but for the negligence of supervisory or administrative personnel who

1   allegedly knew, or should have known, of the counselor's propensities and nevertheless hired,

2   retained and inadequately supervised her." <u>C.A.</u>, 53 Cal. 4th at 865 (citation omitted). Given that

3   "a school district and its employees have a special relationship with the district's pupils," "the

4   duty of care owed by school personnel includes the duty to use reasonable measures to protect

5   students from foreseeable injury at the hands of third parties acting negligently or intentionally."

6   <u>Id.</u> at 869, 870. Thus, the California Supreme Court held that "a public school district may be

7   vicariously liable under section 815.2 for the negligence of administrators or supervisors in

8   hiring, supervising and retaining a school employee who sexually harasses and abuses a student."

9   <u>Id.</u> at 879.

10        Based on <u>C.A.</u>, the Court finds that the SAC's Eighth Cause of Action has identified the

11   statutory basis for PUSD's *vicarious* liability with respect to Plaintiff J.G. To the extent

12   Defendant PUSD moves to dismiss the Eighth Cause of Action with respect to Plaintiff J.G.,[4] the

13   motion to dismiss should be denied.[5]

14        **B.  United States**

15        The United States moves to dismiss pursuant to Rules 12(b)(1) and 12(b)(6), arguing that:

16   (1) Plaintiffs have failed to allege any plausible constitutional violation by unnamed federal

17   actors in their <u>Bivens</u> claims; and (2) the Court lacks jurisdiction over Plaintiffs' negligence

18   claim against the United States because the Federal Tort Claims Act ("FTCA") bars claims for

19   negligent hiring, retention, and supervision. (ECF No. 58; ECF No. 58-1 at 1.)

20        1.  <u>Bivens</u>

21        <u>Bivens v. Six Unknown Federal Narcotics Agents</u>, 403 U.S. 388, 389 (1971), "created a

22   remedy for violations of constitutional rights committed by federal officials acting in their

23   individual capacities. In a paradigmatic <u>Bivens</u> action, a plaintiff seeks to impose personal

---

[4] In the motion to dismiss, Defendant PUSD states that "Plaintiffs' Eighth Cause of Action fails to allege a statutory theory of *direct* liability against Defendant PUSD and they therefore have failed to state sufficient facts to constitute a cause of action." (ECF No. 55-1 at 5 (emphasis added).) However, in the section addressing the Second Cause of Action, Defendant PUSD stated that it "agrees that Government Code § 815.2, provides for vicarious liability for causes of action against an employee acting within the course and scope of their employment." (ECF No. 55-1 at 3.)
[5] PUSD also asserts that the Eighth Cause of Action is redundant to the Second Cause of Action and should be dismissed. (ECF No. 55 at 2; ECF No. 55-1 at 2.) However, as Defendant PUSD provides no explanation or cites any authority for the proposition that a negligent hiring, retention, and supervision claim may be dismissed solely on the ground that it may be redundant or duplicative of a negligence claim, the undersigned declines to recommend dismissal on this ground.

1 liability upon a federal official based on alleged constitutional infringements he or she

2 committed against the plaintiff." Consejo de Desarrollo Economico de Mexicali, A.C. v. United

3 States, 482 F.3d 1157, 1173 (9th Cir. 2007).

4         Plaintiffs allege that their Bivens claim is based on violations of the Fourth and/or

5 Fourteenth Amendment to the U.S. Constitution. (ECF No. 50 at 3–4.) The United States argues

6 that Plaintiffs fail to state a claim because the Fourteenth Amendment does not apply to federal

7 actors and the Fourth Amendment protects against unreasonable searches or seizures, which is

8 not alleged in the SAC. (ECF No. 58-1 at 9–10.) In the opposition, "Plaintiffs agree that the

9 claim should more properly be brought under the Fifth Amendment, rather than the Fourth

10 Amendment" and request leave to amend. (ECF No. 63 at 10, 11.)

11         Courts "should freely give leave [to amend] when justice so requires," Fed. R. Civ. P.

12 15(a)(2), and this "policy of allowing amendments is to be applied with extreme liberality,"

13 Waldrip, 548 F.3d at 732 (internal quotation marks and citation omitted). However, a court "may

14 exercise its discretion to deny leave to amend due to 'undue delay, bad faith, or dilatory motive

15 on part of the movant, repeated failure to cure deficiencies by amendments previously allowed,

16 undue prejudice to the opposing party . . . , [and] futility of amendment." Carvalho, 629 F.3d at

17 892–93 (alterations in original) (quoting Foman, 371 U.S. at 182). "Futility of amendment can,

18 by itself, justify the denial of a motion for leave to amend." Bonin, 59 F.3d at 845.

19         Here, the Court previously granted Plaintiffs leave to amend "to clarify the Bivens claim

20 regarding the constitutional violation at issue and the federal officials involved in said

21 constitutional violation." (ECF No. 44 at 20.) Plaintiffs did not fully utilize this previous

22 opportunity. The SAC merely asserts that Does 1 to 10 violated the "FOURTH AMENDMENT

23 TO THE U.S. CONSTITUTION, AND/OR THE FOURTEENTH AMENDMENT TO THE

24 U.S. CONSTITUTION" without further explication. (ECF No. 50 at 4.) Moreover, the Court

25 finds, for the reasons set forth below, that any further amendment would be futile.

26         In the recent case of Egbert v. Boule, 142 S. Ct. 1793 (2022), the United States Supreme

27 Court explained the following steps for evaluating a constitutional claim for damages against a

28 federal official:

> To inform a court's analysis of a proposed *Bivens* claim, [the Supreme Court's] cases have framed the inquiry as proceeding in two steps. First, we ask whether the case presents a new *Bivens* context—i.e., is it meaningfully different from the three cases in which the [Supreme] Court has implied a damages action. Second, if a claim arises in a new context, a *Bivens* remedy is unavailable if there are special factors indicating that the Judiciary is at least arguably less equipped than Congress to weigh the costs and benefits of allowing a damages action to proceed. If there is even a single reason to pause before applying *Bivens* in a new context, a court may not recognize a *Bivens* remedy.

Egbert, 142 S. Ct. at 1803 (alterations added) (citations, internal quotation marks, and brackets omitted). These steps "often resolve to a single question: whether there is any reason to think that Congress might be better equipped to create a damages remedy." Id. (internal quotation marks omitted). Thus, the issue before the Court is thus whether Plaintiffs' proposed amended Bivens claim—a Fifth Amendment claim against "National Guard employees (which have been named as Defendants DOES 1 TO 10) [who] helped to vet, recommend and place Mr. Van Norton at PMA/PUSD" (ECF No. 50 at 5)—involves a new context, and if so, whether there are special factors indicating that the Judiciary is at least arguably less equipped than Congress to weigh the costs and benefits of allowing a damages action to proceed.

### a.   New Context

A case presents a new context if it "is different in a meaningful way from previous Bivens cases decided by [the Supreme] Court." Ziglar v. Abbasi, 582 U.S. 120, 139 (2017). The Supreme Court has declined "to create an exhaustive list of differences that are meaningful enough to make a given context a new one," id., but provided the following instructive examples:

> A case might differ in a meaningful way because of the rank of the officers involved; the constitutional right at issue; the generality or specificity of the official action; the extent of judicial guidance as to how an officer should respond to the problem or emergency to be confronted; the statutory or other legal mandate under which the officer was operating; the risk of disruptive intrusion by the Judiciary into the functioning of other branches; or the presence of potential special factors that previous *Bivens* cases did not consider.

Abbasi, 582 U.S. at 139–40.

As to the three cases that the Supreme Court has allowed to proceed under Bivens, the Supreme Court has summarized those cases as follows:

1
2
3
4
5
6

> In *Bivens v. Six Unknown Fed. Narcotics Agents*, the Court broke new ground by holding that a person claiming to be the victim of an unlawful arrest and search could bring a Fourth Amendment claim for damages against the responsible agents even though no federal statute authorized such a claim. The Court subsequently extended *Bivens* to cover two additional constitutional claims: in *Davis v. Passman*, a former congressional staffer's Fifth Amendment claim of dismissal based on sex, and in *Carlson v. Green*, a federal prisoner's Eighth Amendment claim for failure to provide adequate medical treatment.

7   <u>Hernandez v. Mesa</u>, 140 S. Ct. 735, 741 (2020) (citations shortened).

8         Here, Plaintiffs have requested leave to amend and their proposed amended <u>Bivens</u> claim

9   is a Fifth Amendment claim against unnamed Army National Guard employees. Plaintiffs

10  contend that "the Fifth Amendment due process clause provides constitutional protection for

11  bodily integrity, and the Fifth amendment's equal protection component extends to sexual

12  violence." (ECF No. 63 at 10.) Other than generalized assertions regarding the scope of the Fifth

13  Amendment's protections, Plaintiffs do not provide specific allegations regarding how Army

14  National Guard employees violated the Fifth Amendment.

15        The only Supreme Court case finding a <u>Bivens</u> claim under the Fifth Amendment is

16  <u>Davis</u>, where the Supreme Court held that the plaintiff—an administrative assistant to a United

17  States congressman who was fired because she was a woman—could sue for damages for a

18  violation of the Due Process Clause of the Fifth Amendment. This is clearly a different context

19  than Plaintiffs' proposed amended <u>Bivens</u> claim regarding bodily integrity and sexual violence.

20  "Given [the Supreme] Court's expressed caution about extending the <u>Bivens</u> remedy . . . the

21  new-context inquiry is easily satisfied," <u>Abbasi</u>, 582 U.S. at 149, and the Court finds that

22  Plaintiffs' proposed amended claim would be seeking a <u>Bivens</u> remedy in a new context.

23                **b.  Special Factors**

24        Once the Court finds that claims arise in a new context, the Court must apply a "special

25  factors" analysis to determine whether "special factors indicate that the Judiciary is at least

26  arguably less quipped than Congress to weigh the costs and benefits of allowing a damages

27  action to proceed." <u>Egbert</u>, 142 S. Ct. at 1803. In this analysis, the Court looks to "whether there

28  is any rational reason (even one) to think that *Congress* is better suited to weigh the costs and

1 benefits of allowing a damages action to proceed." <u>Egbert</u>, 142 S. Ct. at 1805 (citation and

2 internal quotation marks omitted). "[I]n most every case" the Court should defer to Congress and

3 find that "no *Bivens* action may lie." <u>Id.</u> at 1803.

4       Here, Defendant United States contends that the "military context of this case is a

5 significant factor counselling hesitation in the creation of a *Bivens* remedy." (ECF No. 65 at 6.)

6 In support of this argument, Defendant United States cites to <u>Vance v. Rumsfeld</u>, 701 F.3d 193

7 (7th Cir. 2012), in which the Seventh Circuit recognized that the "[t]he Supreme Court has never

8 created or even favorably mentioned the possibility of a non-statutory right of action for damages

9 against military personnel, and it has twice held that it would be inappropriate to create such a

10 claim for damages." <u>Id.</u> at 199.

11       Given the facts here draw even more of a distinction from <u>Bivens</u> than those in <u>Egbert</u>,[6]

12 the Court finds that "[t]his case is not the rare exception," <u>Mejia v. Miller</u>, 61 F.4th 663, 669 (9th

13 Cir. 2023). Applying the Supreme Court's recent directions, and as Plaintiffs' claims arise in a

14 new context and there is at least one special factor indicating that the Judiciary is at least

15 arguably less equipped than Congress to weigh the costs and benefits of allowing <u>Bivens</u>

16 damages actions to proceed, the undersigned recommends that the United States' motion to

17 dismiss be granted on this ground and Plaintiffs' <u>Bivens</u> claim be dismissed with prejudice.

18                  2.  <u>Federal Tort Claims Act</u>

19       "The United States enjoys immunity from suit unless it has expressly waived such

20 immunity and consented to be sued. Such waiver cannot be implied, but must be unequivocally

21 expressed. When the United States has not unequivocally consented to suit, a court must dismiss

22 the case, because such consent is a prerequisite for jurisdiction." <u>Nieves Martinez v. United</u>

23 <u>States</u>, 997 F.3d 867, 875–76 (9th Cir. 2021) (internal citations and quotation marks omitted).

24 The Federal Tort Claims Act ("FTCA") "constitutes a limited waiver of sovereign immunity," <u>id.</u>

25 at 876, and provides in pertinent part:

26 ///

---

27 [6] "In *Egbert*, a border patrol agent allegedly used excessive force against a Washington resident (Boule) in the
driveway of his home. His property backed to the Canadian border and was notorious for illegal crossings and
28 smuggling." <u>Mejia</u>, 2023 WL 2350630, at *4.

> "[T]he district courts . . . have exclusive jurisdiction of civil actions on claims against the United States, for money damages . . . for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred."

28 U.S.C. § 1346(b)(1).

"The liability of the United States under the FTCA is subject to the various exceptions contained in § 2680, including the 'discretionary function' exception," United States v. Gaubert, 499 U.S. 315, 322 (1991), which provides that the United States is not liable for:

> Any claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.

28 U.S.C. § 2680(a). "Because the purpose of the exception is to prevent judicial second-guessing of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort, when properly construed, the exception protects only governmental actions and decisions based on considerations of public policy." Gaubert, 499 U.S. at 323 (internal citations and quotation marks omitted).

"The Ninth Circuit applies a two-step analysis when determining whether conduct falls under the discretionary-function exception." Nieves Martinez, 997 F.3d at 876 (citing Sabow v. United States, 93 F.3d 1445, 1451 (9th Cir. 1996)).

> First, we ask whether the challenged actions involve an element of judgment or choice. If a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow, the act is not discretionary because the employee has no rightful option but to adhere to the directive. Second, if the court determines that the challenged actions involve an element of choice or judgment, the court then determines whether that judgment is of the kind that the discretionary function exception was designed to shield. More specifically, if the judgment involves considerations of social, economic, or political policy, the exception applies.

Nieves Martinez, 997 F.3d at 876 (internal citations, quotation marks, and brackets omitted).

Defendant United States argues that this Court previously held that Plaintiffs' claims for negligent hiring, supervision, employment, training, and failure to warn fall within the discretionary function exception and that Plaintiffs' FTCA claim should be dismissed under established law of the Ninth Circuit as well as the law of the case. (ECF No. 58-1 at 4–7.) In the opposition, Plaintiffs contend that their Second Cause of Action encompasses much more than just negligent hiring, employment, supervision, and training, directing the Court's attention to the respondeat superior allegations (Van Norton was acting in his capacity as an employee of Defendant United States), the allegations that Defendant United States failed to act on other allegations, investigations, and complaints about Van Norton's inappropriate behavior, and the allegations that Defendant failed to have appropriate policies, procedures, and actions in place to ensure that Defendant's employees promptly identify, address, correct, and/or warn about the dangers that caused Plaintiffs' injuries. (ECF No. 63 at 5–6.) Plaintiffs also argue that the blanket statement that negligent hiring, training, and supervision of employees are barred by the FTCA "is simply incorrect." (Id. at 6.)

Plaintiffs' arguments in the opposition are similar to the arguments previously raised by Plaintiffs in their opposition to the motion to dismiss the FAC. (Compare ECF No. 63 at 5–8 with ECF No. 40 at 6–7.) This Court previously considered those arguments in determining that:

> The Ninth Circuit and other courts "have held that decisions relating to the hiring, training, and supervision of employees usually involve policy *judgments* of the type Congress intended the discretionary function exception to shield." Miller v. United States, 992 F.3d 878, 886 (9th Cir. 2021) (internal quotation mark omitted) (quoting Vickers v. United States, 228 F.3d 944, 950 (9th Cir. 2000)). See Nurse v. United States, 226 F.3d 996, 1001 (9th Cir. 2000) (holding that plaintiff's claims of "negligent and reckless employment, supervision and training of" employees "fall squarely within the discretionary function exception").
>
> In support of their contention that the FAC appropriately alleged facts to support a claim for negligent hiring, supervision, employment, and training, Plaintiffs cite to: Senger v. United States, 103 F.3d 1437 (9th Cir. 1996); Brock v. United States, 64 F.3d 1421 (9th Cir. 1995); Bennett v. United States, 803 F.2d 1502 (9th Cir. 1986); and Lins v. United States, 847 F. App'x 159 (4th Cir. 2021). These cases are distinguishable from the instant matter. Senger and Bennet concerned the "assault and battery" or intentional tort exception to the FTCA rather than the discretionary function exception at issue here.[7] In Brock, the district court

---

[7] See Gregory C. Sisk, Holding the Federal Government Accountable for Sexual Assault, 104 Iowa L. Rev. 731, 753 (2019) ("While the Ninth Circuit may not extend the FTCA's assault-and-battery exception to cover episodes of

dismissed the plaintiff's FTCA negligent supervision claims because they were precluded by Title VII of the Civil Rights Act of 1964. 64 F.3d at 1422. The Ninth Circuit reversed, holding that although Title VII is the exclusive remedy for federal employees' claims of sexual discrimination, the plaintiff's rape was a highly personal violation beyond the meaning of discrimination and was separately actionable under the FTCA. Id. at 1423–24. In Lins, the Fourth Circuit disagreed with the Ninth Circuit's decision in Nurse, stating that "we do not agree that these cases unequivocally bar negligent hiring, supervision, and retention claims." 847 F. App'x at 164. However, Lins is an unpublished opinion by the Fourth Circuit that is not binding on this Court.

The Court finds Doe v. Holy See, 557 F.3d 1066 (9th Cir. 2009), to be instructive. The plaintiff was sexually abused by a priest and brought claims for negligent retention and supervision and negligent failure to warn against entities related to the Catholic Church because they knew or should have known that the priest had a history of sexually abusing children. Id. at 1069. The Ninth Circuit held that the district court erred in exercising jurisdiction over these claims based on the discretionary function exception to the Foreign Sovereign Immunities Act ("FSIA").[8] Id. at 1083. The Ninth Circuit found that the plaintiff did not plead any actions that fell facially outside the discretionary function exception because: he did not state the terms of the alleged policy "of not firing priests for, and not warning others about, their abusive acts" or "describe any documents, promulgations, or orders embodying" said policy; and the complaint did not otherwise allege that the decisions to retain the priest and not warn about his proclivities involved no element of judgment, choice, or discretion. Holy See, 557 F.3d at 1084. "[T]he decision of whether and how to retain and supervise an employee, as well as whether to warn about his dangerous proclivities, are the type of discretionary judgments that the exclusion was designed to protect" because "social, economic, or political policy considerations could have influenced the decision." Id. at 1085.

Similarly, here, whether and how to hire, retain, train, and supervise employees, as well as whether to warn about an employee's dangerous proclivities, are ordinarily discretionary, and Plaintiffs have not alleged that said decisions were constrained by a federal statute, regulation, or policy, or involved no element of judgment, choice, or discretion. See Berkovitz by Berkovitz v. United States, 486 U.S. 531, 536 (1988) ("[C]onduct cannot be discretionary unless it involves an element of judgment or choice. Thus, the discretionary function exception will not apply when a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow." (internal citation omitted)); Holy See, 557 F.3d at 1084 ("While the burden of pro[of] ... ultimately falls on the ... entity asserting the discretionary function exception, 'a plaintiff must advance a claim that is facially outside the discretionary function exception in order to survive a motion to dismiss.'" (quoting Prescott v. United States, 973 F.2d 696, 702 & n.4 (9th Cir. 1992))). Accordingly, Plaintiffs' claims for negligent hiring, supervision, employment, training, and failure to warn fall within the discretionary function

---

careless employee management, that court has since regarded claims that challenge decisions by policy-makers on training and supervision as 'fall[ing] squarely within the discretionary function exception' to the FTCA. Thus, even in the single circuit that has recognized the distinction between a claim for negligence in hiring and supervision and direct vicarious liability for assault and battery, many such claims are doomed to failure." (citation and footnote omitted)).

[8] The language of the FSIA's "discretionary function closely parallels the language of a similar exclusion in the Federal Tort Claims Act ("FTCA"), so we look to case law on the FTCA when interpreting the FSIA's discretionary function exclusion." Holy See, 557 F.3d at 1083.

exception, and undersigned recommends that the Second Cause of Action be dismissed.

. . .

To the extent that the Second Cause of Action also includes "respondeat superior allegations regarding Mr. Van Norton, who was acting in his capacity as Defendant National Guard's employee," (ECF No. 40 at 6), it is still subject to dismissal due to the FTCA's intentional tort exception, as argued by Defendant in the reply, (ECF No. 41 at 5). The FTCA's "broad waiver of sovereign immunity is subject to a number of exceptions set forth in § 2680. One such exception, relating to intentional torts, preserves the Government's immunity from suit for '[a]ny claim arising out of assault, battery, false imprisonment, false arrest, malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, or interference with contract rights.'" Millbrook v. United States, 569 U.S. 50, 52 (2013) (quoting 28 U.S.C. § 2680(h)). "[N]egligence based entirely on a theory of respondeat superior . . . cannot give rise to liability on the part of the United States under the FTCA for the intentional torts of government employees[.]" Senger, 103 F.3d at 1441. Accordingly, the Second Cause of Action should be dismissed.

(ECF No. 44 at 22–25 (footnotes in original).)

In support of their contention that the SAC appropriately alleges facts to support a claim for negligent hiring, supervision, employment, and training, Plaintiffs now cite to two new cases not previously raised—Sheridan v. United States, 487 U.S. 392, 401 (1988), and Doe v. Hagee, 473 F. Supp. 2d 989 (N.D. Cal. 2007). (ECF No. 63 at 6.) However, as noted by Defendant United States in the reply, (ECF No. 65 at 3), neither Sheridan nor Hagee involved the discretionary function exception but rather the intentional tort exception.

Although unclear, it also appears that Plaintiffs argue that the United States is liable under the FTCA for violations of Title IX of the Educational Amendments of 1972. (ECF No. 63 at 8 ("Among other things, Title IX creates a responsibility where Defendant knows or reasonably should know about sexual harassment or sexual violence (such as rape, sexual assault, sexual battery, and sexual coercion), then Defendant must take immediate action to eliminate the sexual harassment or sexual violence, prevent its recurrence, and address its effect.").)

Plaintiffs suggest, without support, that an FTCA claim can be brought for violations of federal statutes that provide private *federal* causes of action, even if there is no analogous state law. This is not so. The Supreme Court has addressed a similar issue in regards to a "constitutional tort" claim brought against the

government for alleged due process violations. *FDIC v. Meyer*, 510 U.S. 471, 475–79, 114 S.Ct. 996, 127 L.Ed.2d 308 (1994). The Court held that "the United States simply has not rendered itself liable under [the FTCA] for constitutional tort claims," reasoning that they "have consistently held that [the FTCA's] reference to the 'law of the place' means law of the State-the source of substantive liability under the FTCA. By definition, federal law, not state law, provides the source of liability for a claim alleging the deprivation of a federal constitutional right." *Id.* at 478, 114 S.Ct. 996 (citations omitted).

Delta Sav. Bank v. United States, 265 F.3d 1017, 1024 (9th Cir. 2001). See Love v. United States, 60 F.3d 642, 644 (9th Cir. 1995) ("The breach of a duty created by federal law is not, by itself, actionable under the FTCA.").

Here, the previous findings and recommendations, which were adopted in full by the District Judge, found that "Plaintiffs' claims for negligent hiring, supervision, employment, training, and failure to warn fall within the discretionary function exception," but nevertheless granted Plaintiffs leave to amend "to plead claims that are facially outside the discretionary function exception." (ECF No. 44 at 24, 28.) Although given an opportunity to amend, Plaintiffs do not plead any actions that fall facially outside the discretionary function exception (*e.g.*, allegations regarding any policy of not firing employees for, and not warning others about, their abusive acts or otherwise alleging that the decision to retain Van Norton and not warn about his proclivities involved no element of judgment, choice, or discretion). See Holy See, 557 F.3d at 1084. Accordingly, the undersigned recommends that the Second Cause of Action against the United States and Does 1–10 be dismissed with prejudice.

## V.   CONCLUSION

Accordingly, the undersigned HEREBY RECOMMENDS that:

1. Defendant Porterville Unified School District's motion to dismiss (ECF No. 55) be GRANTED IN PART and DENIED IN PART;

2. Defendant United States' motion to dismiss (ECF No. 58) be GRANTED;

3. Plaintiff Fisher's negligence claims set forth in the Second and Eighth Causes of Action be DISMISSED without leave to amend;

4. Plaintiffs' Bivens claim be DISMISSED without leave to amend; and

5.  Plaintiffs' negligence claim against Defendant United States in the Second Cause of Action be DISMISSED without leave to amend.

These Findings and Recommendations will be submitted to the United States District Court Judge assigned to this action pursuant to the provisions of 28 U.S.C. § 636 (b)(1). Within **FOURTEEN (14) days** after being served with a copy of these Findings and Recommendations, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." Any reply to the objections shall be served and filed within **FOURTEEN (14) days** after service of the objections. The parties are advised that failure to file objections within the specified time may result in the waiver of rights on appeal. Wilkerson v. Wheeler, 772 F.3d 834, 839 (9th Cir. 2014) (citing Baxter v. Sullivan, 923 F.2d 1391, 1394 (9th Cir. 1991)).

IT IS SO ORDERED.

Dated:   **March 24, 2023**                    /s/ Erica P. Grosjean

                                                UNITED STATES MAGISTRATE JUDGE